# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| STEPHEN C. STANKO, <br><br> *Plaintiff*, <br><br> v. <br><br> SOUTH CAROLINA DEPARTMENT OF CORRECTIONS; JOEL E. ANDERSON, Interim Director, SCDC; COLIE RUSHTON, Director of Security & Emergency Operations, SCDC; STEPHEN DUNCAN, Warden, Broad River Correctional Institution; and LYDELL CHESTNUT, Deputy Warden, Broad River Correctional Institution, <br><br> *Defendants*, <br><br> and <br><br> HENRY DARGAN MCMASTER, in his official capacity as Governor of the State of South Carolina, <br><br> *Intervenor–Defendant*. | Civil Action No.: 3:25-cv-4976-RMG-SVH <br><br> **RESPONSE TO SECTION 1983 ACTION UNDER ECF NO. 8 AND TO MOTION FOR STAY (ECF NO. 17)** |

  Henry Dargan McMaster, in his official capacity as Governor of the State of South Carolina; the South Carolina Department of Corrections; Joel E. Anderson, Interim Director of the South Carolina Department of Corrections; Colie Rushton, Director of Security & Emergency Operations of the South Carolina Department of Corrections; Stephen Duncan, Warden of Broad River Correctional Institution; and Lydell Chestnut, Deputy Warden of Broad River Correctional Institution, respond, on an expedited basis to Stephen C. Stanko's section 1983 claim (ECF No. 8). Because of his eleventh-hour lawsuit, the typical way in which such challenges are litigated, and Stanko's subsequent Motion to Stay (ECF No. 17), Defendants treat this filing as in the nature of a response to a preliminary injunction motion. To the extent that ECF No. 8 sought a responsive

pleading, this document may also be construed as a motion to dismiss.

The Court should deny Stanko's request to stay or enjoin his execution, which the S.C. Supreme Court has scheduled for **Friday, June 13, 2025, at 6:00 PM**.

## INTRODUCTION

"Last-minute stays should be the extreme exception, not the norm." *Bucklew v. Precythe*, 587 U.S. 119, 150 (2019). Nothing about Stanko's case is exceptional, and Henry Turner's family "deserve[s] better" than more delay for a sentence that was duly imposed and has been repeatedly upheld. *Id.*

For starters, Supreme Court precedent forecloses Stanko's claims. Because he has elected a method of execution other than the default method, he has "waived any objection" to his choice of lethal injection. *Stewart v. LaGrand*, 526 U.S. 115, 119 (1999). If Stanko wanted to bring a challenge like this one, he had to do so *before* his election.

That's not Stanko's only procedural roadblock. He already raised the factual issue of the alleged botched firing squad and lethal injection executions in the S.C. Supreme Court. That court emphatically rejected Stanko's botched-execution argument. *See* ECF No. 1-27. That precludes Stanko from relitigating the same factual question here, which he must do if he were to prevail on any of his claims.

Even if the Court were to reach the merits, the result is the same. Stanko's botched-execution theory is both factually and legally wrong. Mahdi's firing squad execution and the earlier lethal injection executions went as planned, and Stanko cannot speculate about those executions to support baseless assertions. Plus, Stanko has failed to offer an alternative that would "significantly reduce a substantial risk of severe pain." *Bucklew*, 587 U.S. at 134. Instead, he merely says to "do these methods better" or proposes a method that other inmates have recently

challenged and in which some inmates have showed signs of struggle. So whatever path the Court chooses to resolve this case, Stanko loses.

As with the other condemned inmates who were recently executed, "[t]he people of [South Carolina], the surviving victims of Mr. [Stanko]'s crimes, and others like them deserve better" than more delay. *Id.* at 149. The State has a "significant interest in" finally "enforcing its criminal judgments," *Nelson v. Campbell*, 541 U.S. 637, 650 (2004), and this Court should deny Stanko any relief regarding his execution.

## FACTUAL BACKGROUND

### A. Stanko is sentenced to death for a gruesome murder.

In the early hours of the morning on April 8, 2005, Stanko called Henry Turner, his 74-year-old friend. Stanko told Turner that Stanko's father had died—a lie. Stanko came to Turner's home shortly after this call. Later that morning, Turner was shaving in front of his bathroom mirror. Stanko, gun in hand, approached Turner from behind. Using a pillow as a silencer, Stanko shot Turner. Stanko then struck Turner in the head and put a fatal shot into Turner's chest. Stanko stole Turner's truck, fled to Columbia and then to Augusta, where he continued lying to people (this time about his identity) before eventually being caught and arrested.* *State v. Stanko*, 741 S.E.2d 708, 711 (S.C. 2013).

Stanko was charged with and convicted of murder and armed robbery. *Id.* The S.C. Supreme Court affirmed. *Id.* This Court rejected his habeas petition. *Stanko v. Stirling*, No. 1:19-cv-3257-RMG, 2022 WL 22859294 (D.S.C. Mar. 24, 2022). The Fourth Circuit then affirmed,

---

* This, of course, was not the only murder for which Stanko received a death sentence. In a separate case in Georgetown County, Stanko was sentenced to death for strangling his ex-girlfriend while sexually assaulting her daughter and slitting the daughter's throat (the daughter thankfully survived). *See State v. Stanko*, 658 S.E.2d 94 (S.C. 2008). The S.C. Supreme Court's execution notice was in the case about Turner's murder, out of Horry County.

3

*Stanko v. Stirling*, 109 F.4th 681 (4th Cir. 2024), and the Supreme Court denied cert, *Stanko v. Stirling*, No. 24-6420, 2025 WL 1285097 (May 5, 2025).

      **B.    South Carolina authorized three methods of execution and enacted the shield statute to be able to carry out executions.**

For years, South Carolina could not carry out any executions because SCDC, like many other corrections departments around the country, could not obtain lethal injection drugs and lethal injection was the State's default method for executions. "[T]o address the unavailability of the necessary drugs, and yet enable the State to carry out the sentence of death for inmates upon whom that sentence was lawfully imposed, [the S.C.] General Assembly again amended" the State's method-of-execution statute. *Owens v. Stirling*, 904 S.E.2d 580, 586 (S.C. 2024) (discussing 2021 S.C. Acts No. 43). The amended statute made electrocution the default method, while also giving a condemned inmate the opportunity to elect the firing squad or lethal injection, if those methods are available. *See* S.C. Code Ann. § 24-3-530. SCDC's director must certify for each execution which methods are available after the S.C. Supreme Court issues an execution notice. *Id.* § 24-3-530(B).

After the Governor signed Act 43 into law, condemned inmates (predictably) challenged it. The state trial court held for the inmates, deciding that both electrocution and the firing squad were unconstitutional, as was the State's amended method-of-execution statute. After the first oral argument, the S.C. Supreme Court held most of the case in abeyance and remanded for additional discovery "regarding the State's efforts to procure the drugs for lethal injection and the process it undertook to determine the drugs were not 'available' in South Carolina." *Owens v. Stirling*, 882 S.E.2d 858, 863 (S.C. 2024). The S.C. Supreme Court later stayed the case on remand to give the General Assembly the opportunity to pass a shield statute. The General Assembly did so. *See* 2023 S.C. Acts No. 16. The S.C. Supreme Court then stayed the case on remand again to give SCDC a

4

chance to secure drugs for lethal injection. With the benefit of the newly passed shield statute, SCDC managed to secure pentobarbital.

When the S.C. Supreme Court took up the case again, it reversed the trial court. It held that both electrocution and the firing squad are constitutional under state law, as is the amended methods-of-execution statute. *See generally Owens*, 904 S.E.2d 580. As part of that decision, the S.C. Supreme Court addressed the inmates' concerns over information and explained that "the Director must explain in the affidavit the basis for his determination" under section 24-3-530(B) about which methods of execution are available. *Id.* at 604.

### C. South Carolina carries out five executions.

After the S.C. Supreme Court's decision in *Owens*, the State resumed executions. Freddie Owens was the first inmate executed. He elected lethal injection. According to the witnesses, Owens "appeared to lose consciousness after about a minute," after which "his eyes closed and he took several deep breaths." Jeffrey Collins, *South Carolina Inmate Dies by Lethal Injection in State's First Execution in 13 Years*, Associated Press (Sept. 20, 2024), https://tinyurl.com/3x7662j8. Then, "[h]is breathing got shallower and his face twitched for another four or five minutes before the movements stopped." *Id.*

The second execution was of Richard Moore, who also elected lethal injection. Witnesses to his execution (including one who was also at Owens's execution) described it consistently with Owens's. "Moore took several deep breaths that sounded like snores over the next minute. Then he took some shallow breaths [for about three minutes], when his breathing stopped. Moore showed no obvious signs of discomfort." Jeffrey Collins, *South Carolina Executes Richard Moore Despite Broadly Supported Plea to Cut Sentence to Life*, Associated Press (Nov. 1, 2024), https://tinyurl.com/2s4tc4vr.

5

Marion Bowman was the third inmate executed. He likewise chose lethal injection. He stopped breathing "in less than a minute," and there were no reports that he otherwise moved before being declared dead. Jeffrey Collins, *South Carolina Puts Inmate Marion Bowman Jr. to Death in State's Third Execution Since September*, Associated Press (Jan. 31, 2025), https://tinyurl.com/5a9bmbz4.

Brad Sigmon was the fourth. He elected the firing squad. "His arms briefly tensed when he was shot, and the target was blasted off his chest." After he "appeared to give another breath or two," witnesses observed nothing further before he was pronounced dead. Jeffrey Collins, *A South Carolina Man Executed by Firing Squad Is the First US Prisoner Killed This Way in 15 Years*, Associated Press (Mar. 7, 2025), https://tinyurl.com/bdzmypra.

The fifth execution was of Mikal Mahdi, who like Sigmon elected the firing squad. Mahdi "cried out as the bullets hit him," and the "target with the red bull's-eye over his heart was pushed into the wound in his chest." He "groaned two more times about 45 seconds after that. His breaths continued for about 80 seconds before he appeared to take one final gasp." Jeffrey Collins, *South Carolina Executes Second Man by Firing Squad in 5 Weeks* ("*Mahdi Execution*"), Associated Press (Apr. 11, 2025), https://tinyurl.com/29pfv9sy.

### D. Stanko files last-minute challenges to his execution.

The S.C. Supreme Court issued Stanko's execution notice on May 16, setting his execution date for June 13. *See* ECF No. 1-22; *see also* S.C Code Ann. § 17-25-370 (execution is fourth Friday after the notice is issued). The same day the court issued the notice, Stanko moved for oversight of the certification process, based on the theory that previous executions had been botched. *See* ECF No. 1-23. The S.C. Supreme Court refused to grant Stanko the relief he sought. *See* ECF No. 1-27.

Interim Director Anderson certified, under section 24-3-530(B), that all three methods of execution were available. *See* ECF No. 1-25. Stanko then elected lethal injection by the statutory deadline of 14 days before his execution. *See* ECF No. 1-29.

*After* making that election, Stanko waited another week . . . and then he finally filed this lawsuit. More than 24 hours after that, Stanko eventually moved to stay his execution.

## LEGAL STANDARD

A stay of an execution "should be the extreme exception, not the norm," *Barr v. Lee*, 591 U.S. 979, 981 (2020) (vacating stay), because a State has a "strong interest in enforcing its criminal judgments without undue interference from the federal courts," *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

"A preliminary injunction is an extraordinary and drastic remedy" and "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (internal quotation mark omitted). Plus, there "is the strong presumption against granting a stay of execution." *Baker v. Saar*, 402 F. Supp. 2d 606, 607 (D. Md. 2005). A plaintiff must show four elements to obtain that relief: (1) likelihood of success on the merits, (2) irreparable harm, (3) the balance of the hardship tips in his favor, and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). If a plaintiff fails to satisfy any factor, a court need not consider the remaining factors. *See Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023).

## ARGUMENT

### I. Stanko faces insurmountable procedural hurdles.

**A.** Stanko has waived any challenge to his method of execution. "By declaring his method of execution" and "picking [it] over the State's default form of execution," a condemned inmate "waive[s] any objection he might have" to the method he picked. *Stewart*, 526 U.S. at 119; *accord*

*Miller v. Parker*, 910 F.3d 259, 262 (6th Cir. 2018); *Stanford v. Parker*, 266 F.3d 442, 462 (6th Cir. 2001); *Bell v. True*, 413 F. Supp. 2d 657, 737 (W.D. Va. 2006). (Of course, because Stanko has elected one method, he lacks standing to challenge any others, as it is not "likely" that any "injury will be remedied by the relief" a court might grant in ruling on another method. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008).)

Stanko's attempt to avoid this waiver by saying he wasn't waiving anything when electing lethal injection falls flat. *See* ECF No. 1-29, at 4. Were those couple of sentences sufficient to overcome *Stewart*, that rule would be meaningless. Every inmate would offer a similar statement as an end-run around the Supreme Court's rule. Supreme Court pronouncements are not designed to be so easily ignored or circumvented.

On top of that concern, allowing such a simple skirt of *Stewart* would exacerbate "[t]he seemingly endless proceedings that have characterized capital litigation" in recent decades. *Baze v. Rees*, 553 U.S. 35, 69 (2008) (Alito, J., concurring). At some point, a judgment must be carried out. After all, "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Bucklew*, 587 U.S. at 149. Too often, those interests are "frustrated" by "delay through lawsuit after lawsuit." *Id. Stewart* ensures that such frustrations cease.

This isn't to say that a condemned inmate doesn't have a way to bring a challenge like Stanko's. He just must do so *before* making an election. Stanko did not do that. That's why Stanko's attempt to avoid *Stewart* (buried in a footnote, no less) falls short. *See* ECF No. 17, at 4 n.4. South Carolina has not completely closed the door on claims like Stanko's. It's just sought to close the door on those brought at the eleventh-hour. Nothing is wrong with seeking to promote finality and avoid victims' families being put through the emotional rollercoaster of an on-again, off-again execution.

**B.** Stanko's claims are premised on the assertion that the State's recent lethal injection and firing squad executions were botched. *E.g.*, ECF No. 1, at 19 (subheading A). This is the same theory on which Stanko sought oversight of the certification process from the S.C. Supreme Court. *See* ECF No. 1-23, at 7–17. The S.C. Supreme Court took up those issues and rejected Stanko's arguments. It explained that Stanko had "made no showing that Mahdi's execution [by firing squad] was 'botched'" and, as for lethal injection, the "reasons for the second dose, and any further doses, of pentobarbital are specifically set forth in the protocol." ECF No. 1-27, at 3.

Stanko is therefore precluded from bringing his claims here. "Issue preclusion . . . bars successive litigation of an issue of fact . . . actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quotation marks omitted). The doctrine guards against vexatious litigation, protects judicial resources, and promotes uniformity in judicial decisions. *Id.*

All five elements of issue preclusion are met here. One, the factual question of botched execution is raised in both cases. Two, the S.C. Supreme Court ruled on that question. Three, that question was the central focus of the S.C. Supreme Court's order. Four, the S.C. Supreme Court's decision is final. And five, Stanko had every opportunity to raise the issue in the S.C. Supreme Court and offer any evidence he wanted. There's no reason he could not have offered all the expert reports he attached to his Complaint here in the state court proceeding. *See Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 217 (4th Cir. 2006) (listing issue-preclusion elements).

Stanko unsurprisingly disagrees with the S.C. Supreme Court's decision. *See, e.g.*, ECF No. 17, at 5, 11. But that doesn't entitle him to relitigate this issue now.

**C.** Stanko's delay in bringing this case precludes injunctive relief. "[A] party requesting a

preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). That's because "equity ministers to the vigilant, not to those who sleep upon their rights." *Perry v. Judd*, 471 F. App'x 219, 224 (4th Cir. 2012) (Wilkinson, Agee, and Diaz, JJ.).

Far from "[p]ress[ing]" his claim, ECF No. 17, at 4, Stanko has delayed far too long to obtain injunctive relief just days before his execution. He sought "oversight" from the S.C. Supreme Court—on the very same theory on which he seeks relief here—more than three weeks ago. *See* ECF No. 1-22. So he's known about the basis for these claims for almost a month now. And the S.C. Supreme Court denied his oversight motion nine days before he filed this case. *See* ECF No. 1-27. These days and weeks might not be a big deal in the mine-run case, but they are significant here. For example, the delay between the S.C. Supreme Court's order and this case was more than half the time between that order and Stanko's execution date.

Stanko's delay becomes worse when he points to the shield statute. *See, e.g.*, ECF No. 17, at 6. The General Assembly enacted that law in 2023, so Stanko has known about it for two years now. And he knew it would be relevant to his execution from the moment the Supreme Court denied cert in his federal habeas case. Yet he didn't raise it until six days before his execution.

Stanko cannot delay, manufacture urgency, and then demand a stay based on arguments raised to and rejected by another court. "[L]ast-minute claims that arise from long-known facts counsel the denial of equitable relief in capital cases." *Mills v. Hamm*, 102 F.4th 1245, 1250 (11th Cir. 2024) (cleaned up); *see also, e.g.*, *White v. Johnson*, 429 F.3d 572, 574 (5th Cir. 2005) (no last-minute stay when condemned inmate knew ahead of time the facts giving rise to his claim). As a basic matter of equitable jurisprudence then, Stanko is not entitled to a stay on the eve of his execution.

## II. Stanko is not likely to prevail on the merits.

### A. Stanko's claims are based on a flawed factual premise.

The crux of Stanko's claim is that previous executions—both the firing squad and lethal injection—were botched. Stanko is incorrect (as the S.C. Supreme Court has already held).

**1.** Stanko spends pages complaining about Mahdi's execution. *See* ECF No. 1, ¶¶ 31–65. For all he says on that front, seven brief points confirm that his assertions are equal parts long and wrong.

*First*, Mahdi was struck with three bullets. Two points prove that. One, all three rifles fired. Interim Director Anderson (before submitting his certification for Stanko's execution, *see* ECF No. 1-24) confirmed that each of the three rifles fired and then ejected a spent casing after the execution, Decl. of Joel Anderson, ¶¶ 2, 4 (attached as Exhibit 1). Two, no bullet missed Mahdi and hit somewhere else in the execution chamber, *id.* ¶ 3, a point Stanko concedes, ECF No. 1, ¶ 39.

*Second*, those bullets struck Mahdi's heart. The autopsy describes each track as including "the pericardium" and "the right ventricle." ECF No. 1-19, at 3. And the S.C. Supreme Court recognized as much: "the autopsy shows the firing squad did not miss Mahdi's heart but shot through the pericardial sac and the right ventricle." ECF No. 1-27, at 2. Claims by Mahdi's lawyers and by Stanko that the firing squad "largely missed" are just wrong. Status Report 1, *State v. Mahdi*, No. 2025-000491 (S.C. May 8, 2025); ECF No. 17, at 8 (bullets "failed to directly strike the heart").

*Third*, how bullets react once they strike the body is something that neither SCDC nor the members of the firing squad can control. That one condemned inmate dies more quickly than another does not necessarily mean that something went awry in one execution.

11

*Fourth*, the aim point was placed properly. SCDC conducts a chest x-ray to identify the heart's location, and, with the information from that x-ray, a medical professional uses a stethoscope to place the aim point over the heart after the condemned inmate has been restrained.

*Fifth*, to be sure, the bullets hit the target. As a media witness reported, the "target with the red bull's-eye over his heart was pushed into the wound in his chest." Collins, *Mahdi Execution*. Stanko's contention that anyone "intended not to hit the target," ECF No. 1, ¶ 61; *see also* ECF No. 17, at 9, is wrong and ignores this firsthand media report.

*Sixth*, allegations about pain and suffering are overblown. While Mahdi may have "groaned" two times about 45 seconds after the shots were fired, there was no report of any screaming or wailing. Collins, *Mahdi Execution*. Even Mahdi's expert admitted that "groaning or making similar noises may be conscious or involuntary," Status Report Ex. D, at 7, *State v. Mahdi*, No. 2025-000491 (S.C. May 8, 2025), so there's speculation in that expert's 30-to-60-second estimate for how long Mahdi was conscious, *cf. Owens*, 904 S.E.2d at 595 (refusing to find a method cruel based on "inconclusive" testimony). Ultimately, the Constitution "does not guarantee a prisoner a painless death." *Bucklew*, 587 U.S. at 132. In fact, such a death "isn't guaranteed to many people, including most victims of capital crimes." *Id.* at 132–33. As the S.C. Supreme Court recognized, "the reality [is] that there is simply no elegant way to kill a man." *Owens*, 904 S.E.2d at 592. But the firing squad (both generally and in Mahdi's case) does not "inflict unnecessary and excessive pain that goes well beyond what is reasonably necessary to carry out a death sentence." *Id.* at 594.

*Seventh*, SCDC turned over Mahdi's body for an autopsy. SCDC did not provide any instructions or restrictions on the pathologist regarding photographs or x-rays. In the same way, SCDC provided no such directions regarding other autopsies that have followed the executions of

Moore, Bowman, or Sigmon. Decisions about how the autopsy was conducted belonged to the pathologist alone. Stanko thus gains nothing by complaining about the autopsy.

**2.** Stanko similarly attacks the State's lethal injection executions. *See* ECF No. 1, ¶¶ 66–78. In fact, Stanko's argument is a lot like Marion Bowman's argument about lethal injection. *See* Mot. for Injunctive Relief 9–12, *Bowman v. Stirling*, No. 3:25-cv-199 (D.S.C. Jan. 13, 2025), ECF No. 6. And like Bowman's argument, Stanko's fails. The State's expert in Bowman's case—Dr. Antognini—compellingly explained why. (Dr. Antognini is, no less, the same expert the federal government used in *Barr v. Lee*, when the Supreme Court quickly vacated a stay of execution.)

Lethal injection executions take more than a couple of minutes. A condemned inmate may (and typically does) stop breathing before all electrical activity from his heart ceases. As Dr. Antognini explains, a person's body must use up any stored oxygen after breathing stops, which results in "periodic irregular beats" before "the heart stops all together." Decl. of J. Antognini ¶ 7, *Bowman v. Stirling*, No. 3:25-cv-199 (D.S.C. Jan. 22, 2025), ECF No. 18-1 (attached here as Exhibit 2); *see also id.* ¶ 26; ECF No. 1-3, ¶ 32 (Stanko's expert recognizing this point). So some lag time between when breathing stops and when death is pronounced is both typical and expected. And this lag is consistent with the fact that "it would not be unexcepted that some heart electrical activity persists after 10 minutes," meaning that the second injection would happen under the protocol. Decl. of J. Antognini ¶ 28.

This lag also explains why a second five grams was administered. It's not because the pentobarbital wasn't working. It's because the protocol calls for it—a point the S.C. Supreme Court quickly recognized when it rejected Stanko's argument. *See* ECF No. 1-27, at 3.

On this issue, Stanko again accuses SCDC of bad faith, saying that the certifications of lethal injection by "a single dose of pentobarbital" are wrong. *See* ECF No. 1, ¶ 65 & n.15. A

13

"dose" doesn't necessarily mean a single administration of a drug. A dose is the "quantity of a drug or other remedy to be taken or applied all at one time *or in fractional amounts within a given period*." *Stedman's Medical Dictionary* 581 (28th ed. 2006) (emphasis added) (defining "dose"). Plus, the "single dose" language contrasts with the State's old three-drug protocol. Stanko's arguments about "dose" are therefore much ado about nothing.

Also rebutting Stanko's assertions on lethal injection are that no one—not a media witness, not an inmate's lawyer—ever described any evidence of conscious pain. As Dr. Antognini posited, "If Mr. Moore was conscious and drowning in his own fluids then why didn't he move prior to minute 23 [when he was declared dead]?" Decl. of J. Antognini ¶ 27. (The State's one-drug protocol does not, like the three-drug protocol, include a paralytic drug.) "The answer," of course, "is that Mr. Moore was profoundly unconscious from the pentobarbital," so he felt no pain. *Id.*

### B. Stanko has not alleged a sufficient alternative method of execution.

A plaintiff challenging his method of execution must "show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew*, 587 U.S. at 134. This is "an exceedingly high bar." *Grayson v. Hamm*, No. 2:24-cv-00376-RAH, 2024 WL 4701875, at *13 (M.D. Ala. Nov. 6, 2024). And Stanko has not cleared it.

**1.** Stanko begins by suggesting "competent insertion and monitoring of the IV line and proper storage and testing of compounded pentobarbital." ECF No. 1, ¶ 101. For two reasons, that argument fails. First, it's not an alternative. It's just seeking unnecessary oversight of an existing method.

Second, Stanko has offered nothing to support the claim that SCDC isn't competently inserting or monitoring IVs or is using defective pentobarbital. Stanko discusses executions from

Oklahoma, Ohio, and Indiana, *see* ECF No. 1, ¶¶ 70–78, but he mentions nothing so drastic about any of South Carolina's three lethal injection executions.

Turning to the pentobarbital, three things about Stanko's argument stand out. The first is that he relies on Almgren's affidavit. *See* ECF No. 1-4. That's the same document that Freddie Owens offered in the S.C. Supreme Court, *see* No. 2024-001397 (S.C. Sept. 3, 2024), and in federal court, *see* No. 3:24-cv-5072 (D.S.C. Sept. 13, 2024), ECF No. 1-6, and that Marion Bowman submitted in federal court, *see* No. 3:25-cv-199 (D.S.C. Jan. 10, 2025), ECF No. 1-7. No court has ever granted relief based on that affidavit. The second is that Stanko assumes SCDC is using compounded pentobarbital. SCDC has consistently refused, based on the State's shield statute (S.C. Code Ann. § 24-3-580) to say what type of pentobarbital it has obtained. *See, e.g.*, Am. Final Reply Br. 20–21, *Owens v. Stirling*, No. 2022-001280 (S.C. Jan. 8, 2024). So Stanko's argument is speculative. The third is that Stanko offers no evidence that SCDC isn't doing everything it should be doing to test and store pentobarbital. All he does is say what compounded drugs require. But courts have consistently rejected the idea that inmates are entitled to more information about the drugs. *See, e.g.*, Opinion and Order, *Bowman v. Stirling*, No. 3:25-cv-199 (D.S.C. Jan. 28, 2025), ECF No. 21.

**2.** Stanko fares no better when he argues for a "[c]ompetent [f]iring [s]quad." ECF No. 1, at 52 (subheading 2). Again, this isn't an alternative method.

In any event, his three suggestions of ways to change the firing squad fall far short of the bar he must meet. He first suggests—without evidence—that members of the firing squad do not appreciate the solemnity of their duty or would act in bad faith or be biased. *See* ECF No. 1, ¶ 107. Nothing supports those claims, and media reports noted that the firing squad hit the target in both executions. He then claims that SCDC must use "a portable ultrasound scanner" to find the heart.

*Id.* ¶ 108. But SCDC already does a chest x-ray and has a medical professional place the aim point using a stethoscope. Stanko lastly insists that a "heavier spreading ammunition" should be used. *Id.* ¶ 109. Yet the first two firing squad executions leave no doubt that the ammunition that SCDC uses spreads throughout the chest cavity and causes substantial damage. *See* ECF Nos. 1-17 (Sigmon autopsy); 1-19 (Mahdi autopsy).

**3.** Stanko's only true offer of an "alternative" method is nitrogen gas. It's not clear, however, that this method would "significantly reduce a substantial risk of severe pain." *Bucklew*, 587 U.S. at 134. A report from Alabama's recent nitrogen gas execution claimed that the condemned inmate "rocked his head," "shook and pulled against the gurney restraints," "clenched his fists," "appeared to struggle to try to gesture again," and "took a periodic series of more than a dozen gasping breaths for several minutes." Associated Press, *Alabama Carries Out Nation's 3rd Nitrogen Gas Execution*, NPR (Nov. 22, 2024), https://tinyurl.com/mr3revaf.

Not surprisingly, inmates facing nitrogen gas have filed their own lawsuits, insisting that nitrogen gas is unconstitutional. The inmate who Alabama executed in November 2024, for instance, proposed fentanyl as an alternate method. *See Grayson*, 2024 WL 4701875, at *2.

If nitrogen gas *significantly* reduced a *substantial* risk of *severe* pain, why would an inmate challenge it? Because, in seemingly never-ending capital litigation, whatever method any inmate faces is never the least painful. So (perhaps) it's not the method that's the issue—instead, these inmates just don't want to have their sentences carried out and are willing to make any argument that they can to try to stop their executions. Stanko's argument is therefore like every other condemned inmate's losing argument across the country.

**4.** Stanko tries to dismiss electrocution as an option, *see* ECF No. 1, ¶¶ 87–92, but electrocution does not violate the Eighth Amendment. To start, the Supreme Court has held as

much. *See In re Kemmler*, 136 U.S. 436 (1890); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947). That should end the matter.

But if it somehow weren't enough, Stanko's allegations fail anyway. He cites an expert who says it's "possible" that electrocution is painful because an inmate might not be rendered insensate quickly. ECF No. 1, ¶ 91. "Possible." That's precisely the type of speculative testimony that the S.C. Supreme Court held was insufficient to prove that electrocution is unconstitutionally cruel. *See Owens*, 904 S.E.2d at 595–96. And it's precisely the type of speculative allegation that cannot make a plaintiff likely to show a "*substantial* risk of severe pain." *Bucklew*, 587 U.S. at 134 (emphasis added).

### C. Stanko cannot obtain injunctive relief against SCDC.

Based on "principles of sovereign immunity," "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990) (discussing the Eleventh Amendment). This immunity extends to "state instrumentalities." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).

This Court has consistently held that SCDC is an instrumentality of the State. *See, e.g.*, *Brown v. SC Dep't of Corr.*, No. 8:20-CV-01159-TMC-JDA, 2020 WL 3001787, at *3 (D.S.C. May 15, 2020), *report and recommendation adopted*, No. 8:20-CV-1159-TMC, 2020 WL 2994234 (D.S.C. June 4, 2020); *Gary v. S.C. Dep't of Corr.*, No. CA 8:12-2915-MBS-JDA, 2012 WL 5554098, at *1 (D.S.C. Oct. 23, 2012), *report and recommendation adopted*, No. CA 8:12-2915-MBS, 2012 WL 5553293 (D.S.C. Nov. 15, 2012). *Ex parte Young*, of course, cannot help Stanko, as that fiction applies only to injunctive relief against an "officer" whose official duties include carrying out the challenged law. 209 U.S. 123, 157 (1908). SCDC is not an officer; it's an

17

agency. Given that, it's not clear what basis Stanko has for even naming SCDC as a defendant here.

**III.     The remaining factors cut against an injunction.**

Starting with irreparable harm, the Fourth Circuit has said, without any analysis, that a condemned inmate will face an irreparable harm without an injunction. *See Beaver v. Netherland*, 101 F.3d 977, 979 (4th Cir. 1996). But not all courts agree—especially ones that have analyzed the issue. As one court reasoned, "[i]rreparable harm, in the context of the death penalty, cannot mean the fact of death" because that "would make analysis of this factor meaningless." *Jackson v. Danberg*, No. 06-cv-300, 2011 WL 3205453, at *3 (D. Del. July 27, 2011), *aff'd*, 656 F.3d 157 (3d Cir. 2011); *see also, e.g.*, *Powell v. Thomas*, 784 F. Supp. 2d 1270, 1283 (M.D. Ala. 2011). Instead, a court must consider whether the inmate would suffer some constitutional wrong when his death sentence was carried out. *Jackson*, 2011 WL 3205453, at *3. That logic makes sense, but the Court need not decide whether the Fourth Circuit's single sentence is binding precedent because Stanko cannot meet the other factors. *Cf. Reid v. Johnson*, 333 F. Supp. 2d 543, 550 (E.D. Va. 2004) (analyzing irreparable harm beyond simply "death is sufficient" to satisfy this element).

Taking the last two factors together, *Nken v. Holder*, 556 U.S. 418, 435 (2009), the public interest favors denying injunctive relief. The State has multiple compelling interests here. "Both the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Bucklew*, 587 U.S. at 149. Sadly, those interests are often "frustrated" by "delay through lawsuit after lawsuit." *Id.* Stanko is no exception: He's sought to stop his execution in state court and now federal court. It is hard to credit that Stanko wants only "a pause." ECF No. 17, at 15. Presumably, he'll always have one more challenge if the courts grant him stays. "The people of [South Carolina], the surviving victims of Mr. [Stanko]'s crimes, and others like them deserve

18

better." *Id.* There is even a "moral dimension" to this interest in finality. *Calderon v. Thompson*, 523 U.S. 538, 556 (1998).

The State also has separate interest in ensuring that federal courts do not interfere with its criminal judgments. To be sure, federal courts "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). But in doing so, they "must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill*, 547 U.S. at 584. "The proper role of courts is to ensure that method-of-execution challenges to lawfully issued sentences are resolved fairly and expeditiously. Courts should police carefully against attempts to use such challenges as tools to interpose unjustified delay." *Bucklew*, 587 U.S. at 150. From this role flows the common-sense conclusion that "[l]ast-minute stays should be the extreme exception, not the norm." *Id.* That is why courts must guard against the "Groundhog Day" that is capital litigation so that duly imposed, fully appealed judgments can be carried out. *Glossip v. Gross*, 576 U.S. 863, 893 (2015) (Scalia, J., concurring).

## **CONCLUSION**

The Court should deny Stanko any relief.

Should the Court grant Stanko any injunctive or other relief, Governor McMaster and the SCDC Defendants request that the Court stay any such injunction or other order pending appeal under Federal Rule of Civil Procedure 62 and Federal Rule of Appellate Procedure 8(a)(1).

Respectfully Submitted,

s/Wm. Grayson Lambert
Thomas A. Limehouse, Jr. (Fed. Bar No. 12148)
*Chief Legal Counsel*
Wm. Grayson Lambert (Fed. Bar No. 11761)
*Chief Deputy Legal Counsel &*
*Senior Litigation Counsel*
Erica W. Shedd (Fed. Bar No. 13206)
*Deputy Legal Counsel*
Tyra S. McBride (Fed. Bar No. 13324)
*Deputy Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov
eshedd@governor.sc.gov
tmcbride@governor.sc.gov

*Counsel for Governor McMaster*

and

s/Daniel C. Plyler
Daniel C. Plyler (Fed. Bar No. 9762)
Austin T. Reed (Fed. Bar No. 13405)
Frederick N. Hanna, Jr. (Fed Bar No. 13826)
SMITH │ ROBINSON
3200 Devine Street
Columbia, SC 29205
(803) 254-5445
Daniel.Plyler@SmithRobinsonLaw.com
Austin.Reed@SmithRobinsonLaw.com
Fred.Hanna@SmithRobinsonLaw.com

*Counsel for SCDC, Interim Director*
*Anderson, Director Rushton, Warden*
*Duncan, and Deputy Warden Chestnut*

June 9, 2025