IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| **STEPHEN C. STANKO**, | ) | |
| *Plaintiff,* | ) | Case No. 3:25-cv-04976-RMG-SVH |
| | ) | |
| v. | ) | **This is a capital case.** |
| | ) | |
| **SOUTH CAROLINA DEPARTMENT** | ) | |
| **OF CORRECTIONS** (SCDC); **JOEL** | ) | |
| **E. ANDERSON**, Interim Director, | ) | **EXECUTION SCHEDULED FOR** |
| SCDC, **COLIE RUSHTON**, Director | ) | **JUNE 13, 2025, at 6:00 p.m.** |
| of Security & Emergency Operations, | ) | |
| SCDC; **STEPHEN DUNCAN**, Warden, | ) | |
| Broad River Correctional Institution; | ) | |
| **LYDELL CHESTNUT**, Deputy | ) | |
| Warden, Broad River Correctional | ) | |
| Institution, | ) | |
| | ) | |
| *Defendants.* | ) | |

## REPLY TO INTERVENOR AND ORIGINAL DEFENDANTS' RESPONSE TO COMPLAINT AND STAY MOTION

Plaintiff, Stephen C. Stanko, by and through counsel, replies to Intervenor[1] and Original

Defendants' [hereinafter, collectively "Defendants"] Response to the Complaint and Stay Motion.

ECF No. 20 (responding to ECF Nos. 1 & 17).

_____

[1] Plaintiff consented to the intervention, but the Motion to Intervene (ECF No. 16) contained misstatements of the law that should be corrected. Exercise of this Court's federal judicial authority pursuant to Article III, Section 1 of the United States Constitution and by 28 U.S.C. § 132, and exercise of its jurisdiction and authority to issue the remedies sought in this case pursuant to 28 U.S.C. §§ 1331, 1343, and 1367, and 42 U.S.C § 1983, in no way implicates or infringes on Governor McMaster's limited clemency authority provided by Article IV, Section 14 of the South Carolina Constitution nor his duty to enforce state statute including the secrecy statute (S.C. Code Ann. § 24-3-580). Further, the Governor has no authorities that conflict with federal law. U.S. Const. art. VI, Cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

1

The Response argues first that Mr. Stanko's forced election pursuant to South Carolina Code section 24-3-530, which was made explicitly under protest, waives the violations of his Eighth and Fourteenth Amendment rights alleged in the Complaint. ECF No. 20 at 2, 8 (citing *Stewart v. LaGrand*, 526 U.S. 115, 119 (1999)). Defendants argue that if Plaintiff had only filed this suit prior to making his election under protest, this action would not fall afoul of *Stewart v. LaGrand*, 526 U.S. 115 (1999) (per curiam). The Response further argues that the state supreme court's order denying his request for information needed in order to make an informed election somehow resolved the fact questions raised about the need for second 5-gram doses of pentobarbital in the executions of Freddie Owens, Richard Moore, and Marion Bowman, and therefore the issues raised in the Complaint are precluded. *Id*. at 2 (citing ECF No. 1-27), 9. The Response further argues that Mr. Stanko sat on his rights and delayed bringing this challenge, and therefore should be denied a stay "as a basic matter of equitable jurisprudence." *Id*. at 10.

On the merits, the Response argues a stay is not appropriate because Mr. Stanko is not likely to succeed on the merits,[2] primarily relying on the assertion of a contrary position on the fact questions raised. *Id*. at 11–14. It also argues that the alternative methods raised in the Complaint, required to prove the substantial risk of severe pain is "superadded," are not adequate, in large part because, "Stanko has offered nothing to support" his allegations. *Id*. at 14–17.

This conclusory denial without engaging in the expert opinion in the Complaint underlies the primary arguments in the Response and simply shows there is a controversy that can only be resolved by sufficient fact-finding.

---

[2] The Response also argues the SCDC itself enjoys sovereign immunity. *Id*. at 17–18. Plaintiff agrees, and does not oppose dismissal as to the SCDC itself.

The Response additionally argues, "Stanko has failed to offer an alternative that would 'significantly reduce a substantial risk of severe pain.'" *Id*. at 3, (quoting *Bucklew*, 587 U.S. at 13), 14–17. This is patently mistaken; Plaintiff has offered three such alternatives.

Finally, in assessing the balancing of the equities, the Response fails to address many of the arguments raised in the Stay Motion, and therefore concedes them. *Id*. at 18–19.

For the reasons detailed below, the Response is unavailing.

### A. As Detailed in the Complaint and Stay Motion, Mr. Stanko Has Not Been Dilatory in Raising these Claims

The Defendants' accusation of dilatoriness ignores the diligence Mr. Stanko's counsel have demonstrated starting before these constitutional claims were ripe and continuously since. ECF No. 17 at 4–6. Instead, the Response argues he could have filed his federal claim in this Court even prior to his election of a method. ECF No. 20 at 8. *See* Part B *infra*.

In re-designating the electric chair as the state's method, the scheme that Defendant Governor McMaster signed into law in 2021 has possessed a latent constitutional failing, one that has materialized in the aftermath of Mahdi's firing squad on April 11, 2025. In the wake of this botched execution, the Defendants were not compelled to take a legal position on their statutory scheme until the state supreme court issued Plaintiff's execution notice on May 16, 2025,[3] which then necessitated Defendant Interim Director Anderson's

---

[3] *Owens* addressed the "timing problem for the filing of the Director's affidavit and the inmate's election of a method of execution," adopting a judicial procedure that would allow 28 days between the execution notice and the execution, providing the condemned inmate only eight days between Director's certification and the judicial imposed limitation for seeking a stay of execution from the state supreme court. *Owens v. Stirling*, 904 S.E.2d 580, 604, n. 23 (S.C. 2024) (quoting *In re Stays of Execution in Cap. Cases*, 471 S.E.2d 140, 142 (S.C. 1996)).

certifying affidavit on May 21 and the State's response to Mr. Stanko's Oversight Motion, which they filed May 23, 2025, prior to the South Carolina Supreme Court's denial of the motion on May 28, 2025. As earlier set forth, rather than use these opportunities to address the grave questions Mahdi's execution placed into stark relief, the Defendants have stonewalled and submitted vague representations to prop-up categorical denials—denials that hinge on disputes of fact requiring development in these proceedings.

And even if Plaintiff had filed his Complaint a few days earlier, a stay would still be required to permit discovery and hearing of the evidence, rather than a decision on the pleadings.

**B. In Electing Lethal Injection to Avoid the Electric Chair, Plaintiff Did Not Waive the Statute's Constitutional Violations.**

The Defendants argue that Plaintiff was free to challenge their lethal injection method in this Court, if only he had filed his challenge prior to formally electing the method he needed by the date of his election, which under section 24-3-530, fell on May 30, 2025. ECF No. 20 at 8. Plaintiff. The Defendants fail to offer any authority for this interpretation of *LaGrand*, drawing that particular line. To the extent *LaGrand* applies, this District Court is the necessary forum to argue its constitutional infirmity and the need ultimately for review in the Supreme Court. As the Defendants concede, Plaintiff protested his need to elect and this suit is in keeping with that.

At bottom, Plaintiff's action does not challenge per se the method the scheme has dictated he choose under the present circumstances. Rather, this action challenges the constitutionality of the scheme predicated on the designation of electrocution as the state's

execution method absent an election of a statutory alternative. S.C. Code Ann. § 24-3-530(A). However, the Defendants offer no direct engagement with Plaintiff's core argument in the Complaint or Stay Motion (ECF No. 1 at 47–50; No. 17 at 2–4), but touch upon it in a telling respect in relation to the obligation, in bringing a challenge, to propose a readily implemented alternative method.

In the Defendants' discussion of Plaintiff's proposed alternative methods—proposals that the *Baze*[4] line of cases requires him to make in a civil rights action of this kind, *Bucklew v. Precythe*, 587 U.S. 126 (2019); *Nance v. Ward*, 597 U.S. 159, 165 (2022) (*infra* § D)—they curiously complain that Plaintiff "tries to dismiss electrocution as an option, . . . but electrocution does not violate the Eighth Amendment." ECF No. 20 at 16. Plainly, South Carolina's 113-year-old electric chair is not an alternative method for Plaintiff to plead. Nonetheless, in that respect, the Defendants invoke precedents from 135 and 78 years as authority that electrocution comports with the Eighth Amendment. *In re Kemmler*, 136 U.S. 436 (1890); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947). The age of those cases is not their greatest limitation, however. While these two precedents are indeed the definitive cases as to the electric chair's constitutionality,[5] neither

---

[4] *Baze v. Rees*, 553 U.S. 35 (2008).

[5] In between these two cases falls a notable treatment of South Carolina's chair in *Malloy v. South Carolina*, 237 U.S. 180 (1915), which determined that the statutory transition from hanging to electrocution did not violate the *ex post* facto clause per U.S. Const. art. 1, § 10, cl. 1. On September 29, 1915, Mr. Joe Malloy tied for the 24th electric chair execution that South Carolina carried out on a day in which the state executed five Black men, bringing its total to 25 Black men out of 28 electrocutions since the state's inception of that punishment just three years prior. Attachment A, The Espy File: Executions in the United States, 1608–2002.

In the half-century span ending with the April 20, 1962, electrocution of Mr. Ray Young, which concluded the state's executions prior to *Furman v. Georgia*, South Carolina electrocuted 240

case even applies the Eighth Amendment. *Compare Francis*, 329 U.S. at 463–64 (plurality opinion wherein justices contended that a second electrocution could be attempted *even if* the Eighth Amendment applied to the states), *with Wilkerson v. Utah*, 99 U.S. 130, 134–35 (1878) (holding, "authorities referred to are quite sufficient to show that the punishment of shooting as a mode of executing the death penalty for the crime of murder in the first degree is not included in [the cruel and unusual punishments] category, within the meaning of the eighth amendment.").

*Francis* chronicles Louisiana's infamous debacle in having to twice electrocute a 17-year-old convicted of murdering a small town pharmacist.[6] It was not until fifteen years

---

individuals, 194—or 81%—of whom were Black. Of these 194 persons, 55 were convicted of crimes other than murder, with 50 cases concerning attempted rape or rape convictions. These basic data manifest the method's bleak legacy in the register of human dignity.

[6] Race infuses the case of Willie Francis, a Black teenager, and the white victim he was convicted of murdering. In this vein, just three years earlier, South Carolina's chair obtained an odious distinction in the annals of American capital punishment, claiming the life of the youngest child to be executed in the 20th century, a 90-pound, 5′ tall 14-year-old boy named George Stinney, Jr., who died for the murder of two white girls in Alcolu. ELI FABER, THE CHILD IN THE ELECTRIC CHAIR: THE EXECUTION OF GEORGE JUNIUS STINNEY JR. AND THE MAKING OF A TRAGEDY IN THE AMERICAN SOUTH (2021); Sheri Lynn Johnson, John H. Blume & Hannah L. Freedman, *The Pre-Furman Juvenile Death Penalty in South Carolina: Young Black Life Was Cheap*, 68 S.C. L. REV. 331, 335-37 (2017). Seventy years later, the circuit court overturned the conviction for want of due process. Lindsey Bever, *It Took 10 Minutes to Convict 14-Year-Old George Stinney Jr. It Took 70 Years After His Execution to Exonerate Him*, WASH. POST (Dec. 18, 2014), https://www.washingtonpost.com/news/morning-mix/wp/2014/12/18/the-rush-job-conviction-of-14-year-old-george-stinney-exonerated-70-years-after-execution/.

State to state and heavily in South Carolina, the chair has served to reinforce a Jim Crow legal order. Its restored position at the apex of punishment under the law of South Carolina today puts into relief the role of, as the Nebraska Supreme Court put it, "the dignity of man" in evaluating whether the 21st century should include the electric chair. *State v. Mata*, 745 N.W.2d 229, 278 (Neb. 2008). In its conclusion, *Mata* focused upon the chair's "proven history of burning and charring bodies." *Id.* Of course, the mutilation of bodies in meting out punishment has its own considerable historical weight in South Carolina, a legacy that should bear upon the fundamental question of human dignity the Eighth Amendment now poses.

after *Francis* that *Robinson v. California*, 370 U.S. 660, 666 (1962), finally acknowledged the Fourteenth Amendment's incorporation in the states of the Eighth Amendment's Cruel and Unusual Punishments Clause—seventy-two years after *Kemmler* held that the Eighth Amendment did <u>not</u> apply to the states, 136 U.S. at 446, leaving unexamined the New York state legislature's conclusion that the electric chair caused an "instantaneous, and therefore, painless death." *People ex rel. Kemmler v. Durston*, 7 N.Y.S. 813, 816 (1889).[7]

Nearly four decades following *Francis*, the Supreme Court's last direct consideration of the constitutionality of the electric chair was 40 years ago, in a statement by Justice Brennan dissenting from the denial of certiorari. *Glass v. Louisiana*, 471 U.S. 1080 (1985). Whether or not the Supreme Court's jurisprudence sheds as much light on South Carolina's circumstances as would be hoped, the present scheme and the predicament very largely of these Defendants' making require this Court's application of the Constitution. Article III demands review of this novel, retrograde statutory scheme and the Defendants' performance of its alternative methods in ways to inflict suffering and communicate to those facing lethal punishment an arbitrariness that the Constitution proscribes. Yet, absent this Court's enforcement of due process, the Defendants very well can circumvent these constitutional strictures in this redeployment of its chair.

---

[7] This was promptly undermined in Mr. William Kemmler's execution, which appears to have inspired the coining of the term "botched." *Far Worse Than Hanging*, N.Y. Times, Aug. 7, 1890, at 1–2 (cited in Deborah Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death*, 35 Wm. & Mary L. Rev. 551, 556 at n.20 (1994)).

Regarding that antique device, which SCDC has not used since 2008,[8] there would appear to be no institutional memory of the apparatus's operation on a living person. This context is not an incidental concern. Even in a period of high activity, the 1990s, Florida had botches in short succession stemming from, inter alia, apparent unfamiliarity with the device. *See, e.g.*, *Jones v. State*, 701 So. 2d 76, 77–78 (Fla. 1997) (upholding state and federal constitutionality of Florida's electrocution method based on challenge following botched execution of Mr. Pedro Medina on March 25, 1997) ("The flame and smoke observed during Medina's execution were caused by insufficient saline solution on the sponge in the headpiece of the electric chair."). On July 8, 1999, Allen Davis endured a botched execution wherein he suffered "burns on his scalp and forehead, on his superpubic and right upper medial thigh region, and behind the right knee." *Provenzano v. Moore*, 744 So. 2d 413, 434 (Fla. 1999) (upholding constitutionality of electrocution method) (quoting deposition of medical examiner).[9] Subsequently, the Florida legislature amended its

_____

[8] On June 20, 2008, the execution of Mr. James Earl Reed closed a chapter, if not the book, on South Carolina electrocutions that opened with the execution of Mr. William Reed, another Black man, for the crime of attempted rape on August 6, 1912. Attachment A.

[9] Justice Shaw, dissenting in *Provenzano*, described the available photographic evidence:

> The color photos taken by DOC show a ghastly post-execution scene: Davis is wearing a white shirt and dark pants and is restrained in the wooden chair by thick leather straps placed across his arms, legs, torso, and mouth; the electrical head-piece is attached to the top of his head with a leather strap that runs under his chin; a sponge placed under the head-piece obscures the entire top portion of his head down to his eyebrows; because of the width of the mouth-strap, only a small portion of Davis' face is visible above the mouth-strap and below the sponge, and that portion is bright purple and scrunched tightly upwards; his eyes are clenched shut and his nose is pushed so severely upward that it is barely visible above the mouth-strap; although the exterior openings of Davis' nostrils are partially visible, it appears as though the interior openings may be covered by the mouth-strap; a stream of blood pours from his nostrils, flows over the wide leather mouth-strap,

execution statute to present the alternative of lethal injection. Section 922.105, Fla. Stat. (1999).

In contrast to Florida, the South Carolina legislature's atavistic turn, 109 years after the General Assembly first embraced the electric chair, breaks diametrically against the trendline of execution methods. *See, e.g.*, *Bucklew*, 587 U.S. at 133; *Glossip v. Gross*, 576 U.S. 863, 867–68 (2015); *Malloy*, 237 U.S. at 185 (assigning to General Assembly the "belief that electrocution is less painful and more humane than hanging"). As noted above, in 1912, South Carolina moved via the chair from hangings in county jails to a centralized administration of punishment in state prison. *Malloy*, 237 U.S. at 185. Returning this relic of the early twentieth century to its former perch in the center of South Carolina's criminal legal order creates a new, cynical problem of constitutional moment. The current scheme coerces an ostensible choice between unconstitutionally implemented alternative methods in order for the condemned to escape the potentially grisly fate of the chair. Plaintiff must be permitted to prosecute this lawsuit to address the constitutional questions at bar.

### C. The State Supreme Court Resolution of the Oversight Motion Did Not Resolve the Genuine Issues of Material Fact.

The state supreme court order denying Mr. Stanko's Oversight Motion requesting information about the most recent five executions by lethal injection and firing squad, and denying his request for a stay of execution, concluded that Mr. Stanko "has made no

---

runs down his neck and chest, and forms a bright red pool (approximately eight by twelve inches) on his white shirt. The scene is unquestionably violent.

*Provenzano*, 744 So. 2d at 434–35. Pictures are available online: https://deathpenaltyinfo.org/stories/allen-davis.

showing that Mahdi's execution was 'botched' or that protocols were not followed such that [Stanko] needs further information to make an informed election of the method of his execution." ECF No. 1-27 at 3. It further concluded that Mr. Stanko "has not shown any need for further information on lethal injection." *Id*.

### 1. The Opinion Contained No Explicit Fact Finding.

Before the state court were only documents: the Oversight Motion with its four attached exhibits (ECF No. 1-23[10]), the State's return (ECF No. 1-25), and Mr. Stanko's reply (ECF No. 1-26). The court conducted no evidentiary hearing, not even oral argument of the motion.

On its face the state court order makes no findings of facts. *See* ECF No. 27. Rather it recites seemingly with approval the State's assertions:

> SCDC has developed and implemented protocols and policies to carry out executions by firing squad, and the affidavit of the Interim Director states SCDC has the necessary firearms and ammunition for the execution and that members of the firing squad have completed all required training. . . . The State additionally notes the evidence shows the target was placed on Mahdi's chest as required by protocol, the bullets hit the target, and Mahdi was struck with three bullets.

*Id*. at 2–3.

---

[10] The four exhibits attached to the Oversight Motion are the same as ECF No. 1-19 (Mahdi autopsy report), ECF No. 1-17 (Sigmon autopsy report), ECF No. 1-21 (Arden report), and ECF No. 1-16 (Bowman autopsy report). *See* ECF No. 1-23.

The assertions came exclusively from the State's pleading (consistent with extrajudicial announcements by SCDC[11]) which offers no support whatsoever as to the relevant fact claims: "*First,* Mahdi was struck with three bullets. All three rifles were fired, each with one bullet. . . . *Second,* those bullets hit Mahdi's heart. *Third* . . . the bullets hit the target." ECF No. 25 at 4.[12] Most importantly, the State's return cites no evidence to support its mixed question claim that Mahdi did not suffer unconstitutionally unnecessary or excessive pain without addressing the expert evidence that the left ventricle and the aorta were not wounded, and therefore the heart remained capable of pumping blood at sufficient

---

[11] For example,

> A spokesperson for SCDC disputed the narrative from Mahdi's lawyers, telling CNA that "all three weapons fired simultaneously, and all three bullets struck Mahdi," adding: "Two bullets followed the same trajectory."
>
> "All three bullets struck Mahdi's heart, per the autopsy report," the spokesperson said.
>
> The spokesperson added that "multiple fragments were removed from Mahdi's body," "the autopsy report shows no exit wounds," and "no fragments were found in the room."

Tyler Arnold, *Lawyers for Mikal Mahdi Allege 'Botched' Firing Squad Execution in South Carolina*, CNA (May 12, 2025), https://www.catholicnewsagency.com/news/264061/lawyers-for-mikal-mahdi-allege-botched-firing-squad-execution-in-south-carolina.

[12] The State cited authority for uncontroversial facts that do not support these assertions. For example, "The autopsy [report] shows two paths for the three bullets." *Id*. at 6 (citing ECF 1-19 at 2–3). The autopsy report indeed documents two internal bullet pathways, but it nowhere provides evidence of three bullets. To the contrary, the report documents two entry wounds and two bullet paths. It describes these as "multiple" gunshot wounds, but nowhere provides any reporting that the two paths came from three bullets. The State further claimed the autopsy report supports that the three bullets hit the heart because it shows that one or more fragments pierced the pericardium and the right ventricle. *Id*. at 6 (citing ECF 1-19 at 2).

Elsewhere the Return cites AP reporter Jeffrey Collins's observation that the paper target on Mr. Mahdi was "pushed into the wound in his chest," ostensibly in support of the claim that the three bullets struck the target. *Id*. at 6. The witness observation, as noted in the Complaint documents that unlike the obliterated target in Sigmon's execution, the paper target survived the shooting and was, therefore not struck by all three fragmenting rounds which would, like in Sigmon, cause the target to "disappear[] instantly." ECF No. 1 at 11.

pressure to sustain consciousness beyond the estimate of no more than 15 seconds presented in the state court methods litigation prior to these executions. *See id*. at 6–7; *Owens,* 904 S.E.2d at 600 (2024) ("Dr. Arden's testimony establishes that the outer limit of the period of time in which an inmate will suffer pain—unless there is a massive botch of the execution in which each member of the firing squad simply misses the inmate's heart—is hardly more than fifteen seconds.").

While the order conclusory rules that Mr. Stanko has "made no showing" and "has failed to present any basis," the order nowhere includes even minimal engagement with Mr. Stanko's expert opinion, and the specific evidence drawn from it, especially comparison of the Sigmon and Mahdi autopsy reports[13]. *See* ECF No. 27. Of central importance, it fails to address the indisputable fact that the bullet wounds left Mr. Mahdi's left ventricle and the aorta untouched.

### 2. SCDC's Assertions Continue to be Unsubstantiated

The affidavit of Defendant Anderson claims to have "verified" certain facts without explaining how he verified them:

> 2. I verified that all three firearms were fired and that spent casings were removed from each firearm after the firearms were discharged in the execution of Mikal Mahdi.
>
> 3. I also verified that no projectiles, or fragments thereof, were found in the execution chamber after the execution of Mikal Mahdi. The foregoing is not only consistent with the autopsy report, which did not reflect any exit

---

[13] The state supreme court's failure to engage in factfinding is part of a larger trend of the state supreme court deferring to the executive and legislative branches of state government, thereby necessitating this Court's intervention. *See, e.g.*, *Planned Parenthood S. Atl. v. State*, 892 S.E.2d 121, 153 (S.C. 2023) (Beaty, C.J., dissenting) ("today's decision has impaired our role as an independent and co-equal branch of government," noting "the fear of legislative reprisal is palpable," and "[t]he lack of judicial independence renders a court powerless and places it on the edge of a slippery slope to irrelevance.").

wounds, but also is expected given the intended fragmentation of the three projectiles based on the ammunition used by the firing squad.

ECF No. 20-1 at 2

This party affidavit is of little more value than unsupported pleadings, since it fails to give any information that is subject to any type of evidentiary testing. For example, it fails to state who removed the casings from each firearm, when and where were they removed, or under what circumstances they were removed. It fails to explain how the Defendant verified all three rifles were fired, much less how he was able to verify they were fired in the execution of Mikal Mahdi, especially given the compelling evidence to the contrary detailed in the Complaint.

> **3. Neither Claim nor Issue Preclusion Applies Because the Complaint Raises Claims and Profound Fact Issues Not Raised in the State Court Motion.**

Even if the state court had conducted an evidentiary hearing on the Oversight Motion and had made findings of fact which properly addressed the evidence presented, the Defendants' theory of issue preclusion based on the state court disposition of the Oversight Motion is unavailing, because the legal claims and evidentiary facts at issue in that disposition are distinct from those in this litigation.

Claim and issue preclusion is rooted in the common law doctrine of res judicata, and generally bars re-litigation of a claim previously adjudicated, or an issue previously adjudicated in a different claim. *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008). The federal common law of preclusion is, of course, subject to due process limitations. *Id*. But when the constitutional claims raised in federal court "were not raised in prior state-court pleadings or properly predicated upon them, and they challenge a distinct wrong leading

13

to a distinct injury rather than the claims asserted in prior state-court litigation," "[n]either claim preclusion nor issue preclusion applies." *Gift Surplus, LLC v. N. Carolina ex rel. Cooper*, 605 F. Supp. 3d 711, 722–23 (M.D.N.C. 2022).

That is the case here. The Oversight Motion did not raise *any* state or federal constitutional claims. *See* ECF 1-23. Rather, it requested the state supreme court "exercise its authority to oversee the process of certification of available execution methods pursuant to South Carolina Code section 24-3-530(B)." *Id*. at 1. While this motion was prompted by concerns about the first five executions under the new statute, it very clearly did not raise claims of any constitutional violation. By contrast, the Complaint alleges violations of the Eighth and Fourteenth Amendment. ECF No. 1 at 1. Accordingly, claim preclusion does not apply.

Nor does the present litigation rely on determination of the same questions of fact. For example, the Complaint alleges that it is impossible for three trained shooters to miss the target accidentally, at that range of five yards and under controlled circumstances. *Id*. at 4 (citing ECF No. 1-1 at ¶30). The fact that the two bullet holes pictured and observed post-mortem for Mahdi are emphatically corroborated in the analysis of Plaintiff's forensic pathologist, Dr. Terri Haddix, which reflects the dramatic differences in the distribution within the cavities of Sigmon, who *was* struck by three bullets, and Mahdi, with the latter's thoracic and abdominal cavities laced with fragments in the center-right of his chest but dramatically absent from the left side, where the marksmen where to be firing. ECF No. 1-2 at 3–4.

These allegations appear nowhere in the Oversight Motion, nor are they addressed in the state court adjudication. *See* ECF Nos. 1-23, 1-27. As another example, the Complaint presents extensive evidence and argument about the problem of improperly established or failed intravenous (IV) lines, raising a host of factual issues not mentioned in the Oversight Motion. ECF No. 1 at 30–34. These examples do not exhaust the distinct issues of fact presented in the Complaint that were not presented in the state court motion.

And in any case, as addressed *supra* in subsections C.1–C.2, there was no adjudication of any of the fact questions underlying the Oversight Motion. The court conducted no evidentiary hearing and issued no findings of fact.

Finally, claim and issue preclusion is non-jurisdictional, and are affirmative defenses. *Taylor v. Sturgell,* 553 U.S. 880, 907 (2008). The burden of proof falls on the defendants. *Id*.

> **D. The Alternatives Pleaded in the Complaint are Sufficient to Demonstrate that Refusal to Implement an Elected Method Unconstitutionally "Cruelly Superadds Pain" and Serves No Legitimate Penological Purpose.**

The Supreme Court has reasoned that, "To decide whether the State has cruelly 'superadded' pain to the punishment of death isn't something that can be accomplished by examining the State's proposed method in a vacuum, but only by "compar[ing]" that method with a viable alternative." *Bucklew v. Precythe*, 587 U.S. 119, 136 (2019). The alternative must be "feasible and readily implemented" and must "significantly reduce a substantial risk of severe pain," compared to the challenged method. *Id*. at 140. The alternative must have "a track record of successful use" (*id*. at 142) but need not be currently authorized by the state legislature (*id*. at 153 (Kavanuagh, J., concurring)).

The State argues first that the alternatives proffered in the Complaint to carry out lethal injection and firing squad executions properly—that is, by a single dose of pentobarbital with properly established and maintained IV line, and using properly stored and tested pentobarbital as to the former, and using appropriate ammunition and taking other measure to ensure the heart's ability to pump blood to the brain is instantly disrupted—are not alternatives. ECF No. 20 at 14 ("[I]t's not an alternative. It's just seeking unnecessary oversight of an existing method."), 15 ("Again, this isn't an alternative method."). But the Response fails to explain what requirement in *Bucklew* is not satisfied by these pleadings. Nor does the Response reckon with *Nelson v. Campbell*, which availing brought to the Supreme Court a challenge on the manner of IV insertion in conducting lethal injection, not an attack on lethal injection per se. 541 U.S. 637 (2004). As pleaded in the Complaint, refusal to adopt these measures in performing executions means the Defendants are refusing to adopt a method that entails a significantly reduced risk of severe pain. That the Defendants do not concede the facts pleaded, does not make the pleading somehow inadequate. The Response attempts to disguise as a pleading shortcoming what is actually a glaring genuine issue of material fact, one which cries out for additional process in this Court.

The Response argues that a single "'dose' doesn't necessarily mean a single administration of a drug. A dose is the 'quantity of a drug or other remedy to be taken or applied all at one time *or in fractional amounts within a given period*.'" ECF No. 20 at 13–14 (quoting a medical dictionary). This is mere obfuscation. There is no controversy on what an administration of a second "dose" means. Moore was given two separate 5-gram

doses ten minutes apart.[14] The state supreme court, relying on the secret protocol not yet available to Mr. Stanko's counsel, describes and quotes from the protocol:

> [T]he protocol specifically provides for a second dose and subsequent doses, if needed, and states, "This process will continue until the physician determines death has occurred." The reasons for the second dose, and any further doses, of pentobarbital are specifically set forth in the protocol, which was followed in the most recent lethal injection executions.

ECF No. 27 at 2. The Response's notion that two administrations of massive overdoses separated by ten minutes somehow constitutes a "single dose" lacks any basis in medicine or, for that matter, credibility here. Even if this absurd position were to be taken seriously, it would again present a stark fact question and not a shortcoming in the pleading of the alternatives.

The Response's other objection to the alternative to the way they currently carry out lethal injections lacks any connection to the Eighth Amendment test laid out in *Bucklew*. The Defendants argue that because one piece of evidence attached to the Complaint has been used in other litigation, by other plaintiffs, in matters raising claims legally and factually distinct from those raised in the Complaint, and none of those courts granted the relief sought, this somehow renders the alternative "speculative" or otherwise deficient. ECF No. 20 at 15. Not only does that conclusion not follow from the premise, the premise itself has no connection to the Eighth Amendment test. Nowhere does *Bucklew* say the alternative method pleaded has to rely on evidence that was not presented in any other litigation (successful or not).

---

[14] ECF-23 at 14 ("a second round of 2 x 2.5 g at 18:12") (quoting the Moore autopsy report, filed under seal in Sigmon's objection).

As to the firing squad, the Response again mischaracterizes genuine issues of fact as shortcomings in the pleadings. In the face of the substantial and detailed expert evidence presented to distinguish the way these executions are being carried out from the way they ought to be carried out, the Response simply asserts contrary facts. Where Dr. Haddix's declaration explains in some detail why using an x-ray and a stethoscope to position the target is inadequate (ECF No. 1-2 at ¶31), the Response says, simply that it is. ECF No. 20 at 16. Where Chris Coleman gives detailed expert opinion explaining why the lightweight fragmenting ammunition the SCDC uses is inadequate (ECF No. 1-1 at 3–5), the Response simply says it's fine. ECF No. 20 at 16.

Finally, the Response concedes that death by nitrogen gas is a "true offer of an 'alternative.'" *Id*. But Defendants argue that because the method when improperly administered as it was in a recent Alabama execution failed to reduce the risk of severe pain, it is not a sufficient alternative. *Id*. To be clear, the nitrogen gas alternative proffered in the Complaint includes measures designed to avoid the maladministration of this method. ECF No. 1 at 45–47. As the Complaint explains, because nitrogen is a non-lethal inert gas—the primary component of ordinary air—leaks into an ordinarily ventilated execution chamber pose no risk to those present, the risk of leaks going the other direction, the likely source of the flawed Alabama execution, may be eliminated by maintaining the nitrogen at a slightly higher pressure than ambient air pressure. At any rate, the Defendants' objection to nitrogen gas, again mischaracterizes a fact question as a failure of the pleadings. At bottom, the Defendants can scarcely argue that nitrogen gas is not a viable

alternative in the light of the recent history in two states. If this were so, legal challenges in the state and federal courts would have yielded starkly different outcomes.

### E. Balance of the Equities Favors a Stay to Permit Adequate Resolution of the Important Factual Questions Underlying Mr. Stanko's Constitutional Claims

#### 1. Irreparable Harm.

The Motion for Stay of Execution clearly argues, "the harm of a cruel and unusual execution without at least appropriate process to assess the credibility and weight of the evidence Plaintiff here marshals against the bare unsupported statements of the Defendants, presents a harm that is undeniably irreparable." ECF No. 17 at 12.

The Defendants argue against a straw man position, as if Mr. Stanko were pleading that any execution under any circumstances necessarily entails irreparable harm. ECF No. 20 at 18 (citing *Jackson v. Danberg*, No. CIV. 06-300-SLR, 2011 WL 3205453, at *3 (D. Del. July 27, 2011), *aff'd*, 656 F.3d 157 (3d Cir. 2011)[15] (irreparable harm cannot be satisfied by death alone, but must plead a constitutional violation). While this approach conflates likelihood of success on the merits with the irreparable harm factor, it is unavailing in any case, because the Stay Motion clearly does not plead death alone absent constitutional violations as the irreparable harm.

#### 2. Balance of the Interest if a Stay is Granted or Not Granted

The Response invokes the "interest in the timely enforcement of a sentence" shared by the State and the victims, and asserts that it outweighs the harm of execution (assuming,

---

[15] Unpublished opinion from a district court in another circuit in a state that has abolished the death penalty.

contrary to the pleadings, that the execution is carried out properly). ECF No. 20 at 18–19. But because the Response denies the presence of any interest in a stay because there is no harm absent a stay, this approach does not weight the competing interests as is required.

The Stay Motion, by contrast, acknowledges the interest in carrying out the execution, but points out that the State's conduct leading to a de facto 13-year moratorium, ended by the State's decision to act, shows the interest in executing Mr. Stanko on June 13, 2025, is attenuated. ECF No. 17 at 13–15. Additionally, the motion points out that federal habeas corpus proceedings in Mr. Stanko's case only terminated weeks ago. Plaintiff has not filed "appeal after appeal."

A true weighing of competing interests, favors a stay of sufficient length to permit this litigation, which hangs on stark questions of fact that have yet to be properly reviewed in a trial court.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court grant his motion to stay the June 13, 2025, execution, conduct a hearing on the merits, issue a judgment declaring and enforcing Mr. Stanko's rights as alleged in the Complaint (ECF No. 1), and further to issue a temporary restraining order or preliminary injunction to enforce Mr. Stanko's rights under the Eighth, and Fourteenth Amendments, commanding Defendants to refrain from executing Mr. Stanko, and any other relief to which Mr. Stanko is entitled.

Respectfully submitted,

*/s/ E. Charles Grose, Jr.*
E. CHARLES GROSE, JR. (Fed ID 6072)
The Grose Law Firm, LLC

305 Main Street
Greenwood, SC 29646
(864) 538-4466 (tel)

*/s/ Joseph J. Perkovich*
JOSEPH J. PERKOVICH
Phillips Black, Inc.
PO Box 3547
New York, NY 10163
(212) 400-1660 (tel)
(888) 543-4964 (fax)
j.perkovich@phillipsblack.org

*s/ Joseph C. Welling*
JOSEPH C. WELLING
Phillips Black, Inc.
100 N. Tucker Blvd., Ste. 750
St. Louis, MO 63101
(314) 629-2492 (tel)
(314) 582-1266 (fax)
j.welling@phillipsblack.org

Counsel for Plaintiff Stephen C. Stanko

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2025, I served the foregoing Complaint on all counsel of record via the Court's ECF filing system.

*/s/ E. Charles Grose, Jr.*