## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Stephen C. Stanko,<br><br>          Plaintiff,<br>   v.<br><br>South Carolina Department of Corrections; Joel E. Anderson, Interim Director, SCDC; Colie Rushton, Director of Security & Emergency Operations, SCDC; Stephen Duncan, Warden, Broad River Correctional Institution; and Lydell Chestnut, Deputy Warden, Broad River Correctional Institution,<br><br>          Defendants<br><br>and<br><br>Henry Dargan McMaster, in his official capacity as Governor of the State of South Carolina,<br><br>          Intervenor. | Case No. 3:25-cv-4976-RMG<br><br><br>**ORDER** |

Plaintiff is a state capital defendant with a scheduled execution date of June 13, 2025. On June 6, 2025, Plaintiff brought this case under 42 U.S.C. § 1983 alleging that the State adopted execution methods are unconstitutional and requested a preliminary injunction commanding Defendants to refrain from executing Plaintiff until they can provide assurances that they will do so in a way that does not violate his rights. (Dkt. Nos. 1, 17). Defendants filed a response to Plaintiff's Complaint contesting Plaintiff's allegations and asserting that an injunction is inappropriate because Plaintiff's Complaint is procedural barred and because the State's method of execution meets constitutional standards. (Dkt. No. 20). Plaintiff replied. (Dkt. No. 25). The

1

Court held a hearing on June 11, 2025. For the reasons set forth below, the Court denies Plaintiff's request for a preliminary injunction.

## I.     Background

On June 6, 2025, a week before his scheduled execution, Plaintiff filed this case challenging the constitutionality of South Carolina's method for carrying out one of his two criminal death sentences. The State's method-of-execution statute states that "a person convicted of a capital crime and having imposed upon him the sentence of death shall suffer the penalty by electrocution or, at the election of the convicted person, by firing squad or lethal injection, if it is available at the time of election." S.C. Code Ann. § 24-3-530(A). The statute further provides that the SCDC director must certify for each execution which methods are available after the South Carolina Supreme Court issues an execution notice. *Id.* § 24-3-530(B).

The facts of Plaintiff's case date back to over 20 years ago. In 2005, Plaintiff engaged in a multi-day crime spree that began with the murder of Plaintiff's girlfriend, Laura Ling, and the rape and attempted murder of Ms. Ling's 15-year-old daughter in Georgetown County. That same day, Petitioner drove Ms. Ling's stolen automobile to the Horry County home of Henry Turner and murdered Mr. Turner the following morning.

Plaintiff was tried for his crimes in both Georgetown County and Horry County in 2009. In Georgetown County, Plaintiff was tried for the murder of Ms. Ling and the rape and attempted murder of Ms. Ling's daughter before a jury. The Georgetown County trial resulted in a conviction on all counts and a death sentence on the murder conviction. In Horry County, Plaintiff was convicted by a jury for the first-degree murder of Mr. Turner and armed robbery. The Horry County jury unanimously recommended, and the South Carolina circuit judge imposed, a second death sentence for Plaintiff's murder conviction.

This case is Plaintiff's latest challenge to his Horry County death sentence.

Since his sentencing Plaintiff has extensively challenged his Horry County death sentence. Plaintiff first directly appealed his conviction and death sentence to the South Carolina Supreme Court. The South Carolina Supreme Court affirmed the conviction and sentence in 2013, and the United States Supreme Court denied Plaintiff's petition for writ of certiorari the same year. After his direct appeal of the Horry County conviction and sentence was complete, Plaintiff commenced Post Conviction Relief ("PCR") proceedings. The PCR petition was denied by the state circuit court in 2016, and Plaintiff's subsequent petition for certiorari was denied by the South Carolina Supreme Court in 2019. Plaintiff then filed a habeas petition in this Court, which was finalized in 2021. The Court rejected Plaintiff's habeas petition in 2022. The Fourth Circuit affirmed this Court's decision in 2024, and Supreme Court denied certiorari on May 5, 2025.

On May 16, 2025, the South Carolina Supreme Court scheduled Plaintiff's execution for the fourth following Friday, which falls on June 13, 2025. On May 21, 2025 Defendant Interim Director of SCDC Joel Anderson certified that all three execution methods are available for Plaintiff's execution. On May 30, 2025, Plaintiff elected lethal injection.

On June 6, 2025, Plaintiff filed this lawsuit under 42 U.S.C. § 1983, stating five claims for relief by alleging the State's execution methods violate his rights under South Carolina's and the United States' constitutions.

First, Plaintiff claims that his due process rights are violated by forcing a choice between unconstitutionally performed methods or death by electrocution. Plaintiff details the State's last five executions, which were carried out by either firing squad or lethal injection. Plaintiff argues that those executions were carried out in violation of the United States Constitution's prohibition against cruel and unusual punishment leaving him no viable alternative to electrocution.

3

Second, Plaintiff claims that the second, five-gram dose of pentobarbital given in the State's last three lethal injection executions violates the prohibition against cruel and unusual punishment. Plaintiff argues that a second, five-gram dose of pentobarbital would only be needed if the IV line administering the dose was improperly established or failed or if the pentobarbital was bad. Plaintiff argues that the need for a second dose is evidence of a botched procedure which leads to a slow and painful death.

Third, Plaintiff claims that South Carolina's default method of electrocution violates the prohibition against cruel and unusual punishment. Fourth, Plaintiff claims that South Carolina's performance of lethal injection and firing squad methods vitiates the choice in its statutory scheme in violation of the prohibition against cruel and unusual punishments under the South Carolina Constitution. Fifth, Plaintiff claims that South Carolina's failure to conduct each of South Carolina's execution methods in compliance with the cruel and unusual punishments clause violates his right to procedural due process under the United States Constitution.

Plaintiff pleads three alternative methods for execution: competent implementation of single dose pentobarbital protocol; competent firing squad; and nitrogen gas.

Defendants responded to Plaintiff's Complaint and request for preliminary injunction. The Court held a hearing on June 11, 2025.

## II.    Legal Standard

The court's authority to issue a preliminary injunction arises from Rule 65, but "it is an extraordinary remedy never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must make a clear showing that the plaintiff is entitled to such relief. *Winter*, 555 U.S. at 22. To obtain a preliminary injunction, a plaintiff must: (1) make a clear showing that he is likely to succeed on the merits; (2) make a clear showing

that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) establish the balance of equities tips in his favor; and (4) establish that an injunction is in the public interest. *Id.* at 20; *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010). A district court need not consider all four *Winter* factors if one is clearly absent. *See Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018). The standard for obtaining a temporary restraining order is the same as a preliminary injunction. *Maages Auditorium v. Prince George's County, Md.*, 4 F. Supp. 3d 752, 760 n, 1 (D. Md. 2014).

A party's "inequitable conduct" can foreclose equitable relief like a stay. *Ramirez v. Collier*, 595 U.S. 411, 434 (2022). Equity "strongly disfavors inexcusable delay." *Woods v. Comm'r, Ala. Dep't of Corr.*, 951 F.3d 1288, 1293 (11th Cir. 2020). So "last-minute claims" that arise from "long-known facts" counsel the denial of "equitable relief in capital cases," *Ramirez*, 142 S. Ct. at 1282, and "[l]ast-minute stays" of execution should be "the extreme exception, not the norm" *Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019).

## III. Discussion

### A. Likelihood of Success on the Merits

Plaintiff asserts in Claims 2, 3, 4, and 5 of his complaint that South Carolina's use of a second dose of pentobarbital in administering a lethal injection constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution. (Dkt. No. 1).

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments." *Glossip v. Gross*, 576 U.S. 863, 876 (2015). While the Eighth Amendment does not prohibit capital punishment, it does prohibit methods of execution that are "cruel and unusual." *Bucklew*, 139 S. Ct. at 1123. "[T]he punishment of death is not cruel, within

the meaning of that word as used in the Constitution. [Cruelty] implies . . . something inhuman and barbarous, something more than the mere extinguishment of life." *Bucklew*, 139 S. Ct. at 1124 (quoting *In re Kemmler*, 136 U.S. 436, 447 (1890)). "[T]he Eighth Amendment does not guarantee a prisoner a painless death . . . ." *Id.* Rather, the Eighth Amendment prohibits "long disused (unusual) forms of punishment that intensif[y] the sentence of death with a (cruel) 'superadd[ition]' of 'terror, pain, or disgrace.'" *Id.* (quoting *Baze v. Rees*, 553 U.S. 35, 48 (2008)). The Eighth Amendment also "does not demand the avoidance of all risk of pain in carrying out executions." *Baze*, 553 U.S. at 47.

To establish an Eighth Amendment violation, the prisoner must show that the disputed method presents "a substantial risk of severe pain," meaning that it is "sure or very likely to cause . . . needless suffering." *Glossip* 576 U.S. at 877 (cleaned up). The prisoner also must establish that a feasible alternative execution method would significantly decrease that suffering. *Bucklew*, 139 S. Ct. at 1125 (citing *Glossip*, 576 U.S. at 868–69).

In addition, to obtain a post-habeas stay of execution, the prisoner must show more than "competing expert testimony" on the question whether the government's chosen method is very likely to cause needless suffering. *Lee*, 140 S. Ct. at 2591 (2020); *see also Execution Protocol Cases*, 980 F.3d 123, 135 (D.C. Cir. 2020). This is partly because federal courts are not well suited to resolve "ongoing scientific controversies beyond their expertise." *Glossip*, 576 U.S. at 882 (quoting *Baze v. Rees*, 553 U.S. 35, 51 (2008) (plurality)). Moreover, "[l]ast-minute stays," issued years after the crime and days before the execution, "should be the extreme exception, not the norm." *Lee*, 140 S. Ct. at 2592 (quoting *Bucklew*, 139 S. Ct. at 1134) (cleaned up).

Plaintiff's claims here are based upon several incorrect factual premises regarding the State's recent execution of three capital defendants, Freddie Owens, Richard Moore and Marion

Bowen, which Plaintiff and his experts contend were "botched" and required the use of a second dose of pentobarbital. First, Plaintiff asserts that a five-gram dose of pentobarbital should be sufficient to carry out an execution if properly prepared and administered. Second, based upon this premise, Plaintiff and his experts speculate that the need for a second dose of pentobarbital was necessitated by either an inept placement of IV access or the use of degraded and expired pentobarbital. (Dkt. Nos. 1-3 at 3-7; 1-5 at 8-15). Plaintiff argues that incorrect placement of the IV or use of bad pentobarbital in an execution is cruel and unusual punishment because it leads to a slow and painful death.

Plaintiff offered an affidavit of Dr. Jonathan Groner, a retired pediatric surgeon who has become a regular "go to" expert for the capital defense bar. He endorses the use of firing squads for capital executions as "more humane, in practice than lethal injection." (Dkt. No. 1-3 at 2). Dr. Groner asserts that five grams of pentobarbital should be sufficient to cause death and surmises that if a second dose was required that this reflected a "botched" execution likely caused by an inexpert placement of intravenous line. (*Id*. at 4). Dr. Groner, who indicates that he has reviewed 1,400 lethal injection executions, cites to a handful of incidents over the last 19 years which reflected obvious difficulties with the executions. In one, the defendant sat up, in another the executioners attempted 18 sites across the upper and lower body, and in still a third there was infiltration of IV fluid into the surrounding tissues. (*Id*. at 5-6).

None of the South Carolina lethal injection executions had any reports of these types of complications. To the contrary, reports of journalists covering each of the executions described a rapid loss of consciousness within a minute after the IV began which was followed by shallow breathing and ultimately death. There were no reports of agitation, pain or discomfort and no movement. (Dkt. Nos. 20 at 5-6; 20-2 at 14-15). No one sat up and there was no reported evidence

of IV infiltration. Plaintiff's counsel acknowledged at oral argument that there was no evidence of any complications which arose in the State's three recent lethal injection executions and that Plaintiff's challenge to the use of lethal injection as an execution method is solely based on the administration of a second dose of pentobarbital.

The use of a second dose of pentobarbital is part of South Carolina's protocol for lethal injection and is not administered because the first dose was ineffective. The State's protocol for lethal injection executions provides that a second dose of pentobarbital may be administered at 10 minutes if there is any residual heart activity. As the South Carolina Supreme Court recently ruled in a last-minute challenge brought by Plaintiff, the State's use of a second dose of pentobarbital is provided for in the lethal injection protocol and was followed in the recent lethal injection executions. (Dkt. No. 1-27 at 3).

An affidavit was provided from Dr. Joseph Antognini, a board-certified anesthesiologist and professor of anesthesiology, who explained that pentobarbital rapidly leads to a loss of consciousness, followed by depressed breathing and then cessation of breathing. Dr. Antognini explained that once breathing stops, the body has stored oxygen which keeps the heart functioning at a much lower level even though the defendant is unconscious and without respiratory effort. During this time, Dr. Antognini states that the defendant would not feel sensation of pain, suffocation or air hunger. He explained that the second administration of pentobarbital would be applied to eliminate any electrical activity that remained in the heart at 10 minutes. (*Id*. at 16).

Plaintiff offered the opinion of a second expert, Dr. Almgren, a pharmacologist, who provided an opinion related to a dose of pentobarbital that was allegedly used by Texas over a year past its expiration date. (Dkt. No. 1-5 at 7). Dr. Almgren stated that for compounded pentobarbital, it would remain effective, if frozen, no longer than 45 days. (*Id*. at 6-7). Dr. Almgren did not

provide an affidavit for this case and there is no indication he has any information regarding the potency or effectiveness of the pentobarbital that is to be administered to Plaintiff.

Defendants offered the certification of the Interim Director of the South Carolina Department of Corrections, who stated that the pentobarbital to be used in the upcoming execution has been tested by the internationally accredited forensic lab of the South Carolina Law Enforcement Division and test results showed the pentobarbital to be stable and pure and sufficiently potent for execution purposes. (Dkt. No. 1-24 at 4-5). There is no record evidence challenging that certification.

Plaintiff admits that a properly administered lethal injection execution meets constitutional standards. (Dkt. No. 1 at 51-52). Plaintiff has offered no evidence that any of the State's recent lethal injection executions failed to meet constitutional standards or that the second dose of pentobarbital at 10 minutes was inconsistent with the State's protocol or resulted in any conscious pain and suffering on the part of Plaintiff. The record before the Court fails to demonstrate that Plaintiff's chosen method of execution, lethal injection, violates his rights under the United States Constitution.

In short, the "facts" upon which Plaintiff relies on are based on surmise and speculation. Based on the evidence before the Court, South Carolina has followed its protocol for lethal injections and there have been no reported complications or failed executions. Importantly, there is no evidence that the second dose of pentobarbital used in South Carolina's lethal injection protocol is administered because the first dose failed. While there may have been some isolated examples of "botched" lethal injections in other states, there is simply no evidence of any difficulties in South Carolina that would suggest cruel and unusual punishment. At best, Plaintiff

has offered "competing expert testimony" on the question whether the chosen method is likely to cause needless suffering. This is not sufficient to establish part one of the *Bucklew* standard.

To obtain a stay of execution, Plaintiff has the burden of demonstrating a likelihood of success on the merits. The record before the Court plainly does not meet that standard. Plaintiff's motion to stay is denied.

### B. Procedural Bars

Beyond the fact that Plaintiff's claims have no legal merit and are factually unsupported in the record, they are procedurally barred for at least three separate and independent reasons. First, it is well settled that once a defendant selects a method of execution over the state's default choice, he waives his right to challenge the constitutionality of the selected method. *Stewart v. LeGrand*, 526 U.S. 115, 119 (1999); *Miller v. Parker*, 910 F.3d 259, 262 (6th Cir. 2018). Plaintiff has selected lethal injection as his option for execution over the default option of electrocution. As such, he has waived his objection to lethal injection.

The Court notes that in selecting lethal injection as his option, he attempted to make an end run around *Stewart* by asserting that he was not waiving his right to object to lethal objection. (Dkt. No. 1-29 at 4). As Defendants correctly noted, a capital defendant cannot so easily avoid the mandates of the Supreme Court's decision in *Stewart*.

A second and independent bar to relief for Plaintiff is collateral estoppel. This very same issue, whether the administration of a second dose of pentobarbital reflected a botched execution, was presented to the South Carolina Supreme Court in an emergency petition in May 2025 as a basis for the Supreme Court to oversee Plaintiff's execution. The Supreme Court specifically addressed the second dose of pentobarbital and found that the administration of the second dose was provided in the protocol, which had been followed in each of the prior lethal injection

10

executions. (Dkt. No. 1-27 at 3). After failing to persuade the South Carolina Supreme Court on his claim for recent botched lethal injection executions, Plaintiff brought the very same allegations to this Court, now as Section 1983 claims.

Issue preclusion bars "'successive litigation of an issue or fact actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in a different context." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). Plaintiff's effort to relitigate the alleged botched lethal injections has been already addressed in a prior court decision in which the Plaintiff had a full and fair opportunity to present his claim.

Third, the late filing of this suit is untimely and a transparent effort to present this new claim with voluminous attachments within days before execution as a means to obtain a stay of the execution. Indeed, a motion to stay the execution was filed one day after the Complaint. (Dkt. No. 17). Nothing prevented Plaintiff from filing his Section 1983 action immediately following the denial of certiorari by the United States Supreme Court on May 5, 2025 or upon notice of the execution date entered on May 16, 2025. Instead, Plaintiff held this filing, totaling more than 500 pages, until literally seven days before execution.[1]

Under these circumstances, the Court finds this late filing untimely and a transparent attempt to force the granting of a stay. The Court appreciates the passion and zeal of defense counsel, but they do their capital clients no good by attempting to cram courts at the last moment with motions in an effort to force a court to grant a stay. Fortunately, this tactic is well known by

---

[1] The fact that Plaintiff pursued his relief first with the South Carolina Supreme Court and, only after failing to obtain relief there, filed suit here strongly supports the inference that Plaintiff recognized that the same issue was being presented to both courts.

district courts and anticipated to deal with the brief time between filing and the scheduled execution day. The untimely filing of this complaint is a third independent procedural bar to relief. *Mills v. Hamm*, 102 F.4th 1245, 1250 (11th Cir. 2024) (last minute claims concerning previously known facts counsel against a stay).

**C.  Standing to Challenge Execution Methods Not Selected**

Plaintiff has asserted as parts of Claims 1, 3, 4, and 5 that South Carolina's other two options for execution, electrocution and by firing squad, are unconstitutional and that his rights are somehow violated by the State's use of these execution methods which he did not select. Plaintiff has every right to insist that the execution method used by the State against him meets constitutional standards. He identifies no authority for the novel proposition that he has a right to challenge the constitutionality of execution methods he has not chosen and which will not be used in his execution.

For a plaintiff to assert a viable claim, he must show standing by establishing: (1) an injury in fact; (2) an injury fairly traceable to the defendant's challenged conduct, and (3) plaintiff's injury would likely be redressed by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). A party seeking to invoke federal jurisdiction has the burden of establishing the elements of standing. *Id*. at 561.

Once a capital defendant has selected a particular execution method, he lacks standing to challenge the other execution options he did not choose. Even if he were to be granted relief regarding his challenge to firing squads and electrocution, unlikely under existing precedent, this would provide no relief to Plaintiff since he would still be executed by lethal injection. A similar situation arose in *Bell v. True*, 413 F.Supp.2d 657, 736 (W.D. Va. 2006), where a defendant attempted to challenge the use of lethal injection by the State when he was to be executed by

electrocution. "For Bell's lethal injection claim to be relevant, he would first have to choose it over electrocution." *Id*.

Plaintiff wishes this Court to address and decide the constitutionality of other methods of execution not relevant to this case. The Court declines to do this. Plaintiff has no standing to challenge these other methods of execution and they are not relevant to this suit.

## IV.    Conclusion

For the reasons set forth above, the Court **DENIES** Plaintiff's request for preliminary injunction (Dkt. Nos. 1, 17).

　

         _s/ Richard Mark Gergel____
         Richard Mark Gergel
         United States District Judge

June 11, 2025
Charleston, South Carolina